[Crim. No. 3117. In Bank.—December 27, 1928.]

THE PEOPLE, Respondent, v. JOE TROCHE, Appellant.

Edmund H. Lomasney and Ray T. Coughlin for Appellant.

U. S. Webb, Attorney-General, and William F. Cleary, Deputy Attorney-General, for Respondent.

William R. McKay and John O'Gara, *Amici Curiae.*

WASTE, C. J.—The appellant was charged with the murder of Mary Lorenzo, the killing occurring upon a trip to Nevada, where, according to appellant's story, they intended to be married. On the morning of November 20, 1927, a stockman residing at Negro Hill, Placer County, found the appellant seated back of the steering wheel of an automobile standing on the side of the road. He was in a reclining position, covered with blood, and with a gunshot wound in his head. On the right side of the car was the dead body of the girl. Her death had been caused through severance of the spinal cord from a gunshot wound passing through her neck from left to right. Appellant, who was able to talk, and to walk with assistance, stated to the stockman that he had killed the girl after a quarrel. He also stated to the constable, immediately called to the scene, that he had killed the girl. He made similar statements during his stay in a sanitarium in which he was placed during the time prior to his removal to the county jail. He signed a written statement containing a history of the affair in the office of the district attorney.

On arraignment the defendant entered a plea of not guilty, and also a plea of not guilty by reason of insanity. When the cause came on for trial the court announced that it would submit the trial of both issues to the one jury then about to be selected, and explained to the prospective jurors the nature of the issues raised by the two pleas and the procedure to follow. On the *voir dire* the jurors were examined by the court as to their state of mind on each plea. When the examination of the jurors was completed, and those selected

were sworn to try the cause, defendant, through his counsel, demanded of the court to know if, during the trial on the issue of not guilty, the defense would be permitted to offer evidence tending to prove the insanity of the defendant at the time of the alleged commission of the offense, and was informed that it would not, for the reason, assigned by the court, that on the trial of the issue of not guilty the defendant was "conclusively presumed to be sane."

The defendant, testifying in his own behalf on the trial of the issue of not guilty, claimed that he had no recollection or knowledge of how the tragedy occurred, and remembered nothing of what happened between the time he was driving in the automobile with the deceased and the time he was taken to the county jail. On cross-examination, however, he gave minute details of the trip, and identified doctors, nurses, officials and other people who had seen and talked with him during his stay in the sanitarium and jail, and during the period when he claimed to have no recollection. At the conclusion of the trial of the first issue, which the court restricted to the circumstances connected with the offense and the subsequent conduct of the defendant, the jury returned a verdict of guilty of murder in the first degree, without recommendation. Over the objection of the defense the trial court then directed that the question of the insanity of the defendant, raised by the plea of not guilty by reason of insanity, be forthwith submitted to the same jury which had just rendered the verdict of guilty. At the conclusion of the trial of the second issue the jury returned its verdict that the defendant was sane at the time of the commission of the offense. The trial court thereupon pronounced its judgment and sentence that the defendant be executed on a day fixed. From the judgment and from the order denying his motion for a new trial the defendant has appealed.

The principal arguments for reversal in the case center in an attack on the constitutionality of the recently enacted law prescribing the procedure to be followed when a person accused of the commission of a penal offense interposes a plea of not guilty together with a plea of not guilty by reason of insanity. (Pen. Code, secs. 1016, 1020, 1026.) The questions presented in the instant attack on the validity of the code sections are involved in a number of cases now on ap-

peal to this court. It was because of that fact that a re-argument and resubmission of this case was ordered.

Section 1016 of the Penal Code, which was amended in 1927 (Stats. 1927, p. 1148), to provide for the interposition of a fifth plea, "not guilty by reason of insanity," has already been considered by this court and its validity upheld. (*People* v. *Hickman,* 204 Cal. 470 [268 Pac. 909]; see, also, the more recent case touching the subject, *People* v. *Davis,* 94 Cal. App. 192 [270 Pac. 715].) The provisions of section 1017, also amended in 1927 (Stats. 1927, p. 1149), and which prescribe the form in which pleas to an indictment or information must be entered upon the minutes of the court, being directory and procedural, and not in any way involving any substantive rights of a defendant, are not called in question.

Section 1020 of the Penal Code, also amended in 1927 (Stats. 1927, p. 1149), provides that matters of fact tending to establish a defense under certain pleas, including that of not guilty by reason of insanity, may not be given in evidence under the plea of not guilty. Section 1026 (new in 1927; Stats. 1927, p. 1149) provides that "when a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, he shall first be tried as if he had entered such other plea or pleas only, and in such trial he shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed. If the jury shall find the defendant guilty, . . . the question whether the defendant was sane or insane at the time the offense was committed shall be promptly tried, either before the same jury or before a new jury, in the discretion of the court. In such trial the jury shall return a verdict either that the defendant was sane at the time the offense was committed or that he was insane at the time the offense was committed. If the verdict or finding be that the defendant was sane at the time the offense was committed the court shall sentence the defendant as provided by law." Then follows a provision as to the procedure to be taken in the event the verdict or finding be that the defendant was insane at the time of the commission of the offense, a question not here involved. The particular provisions just noted, and which were strictly followed, are the ones here under attack.

The arguments touching the validity of these provisions have been advanced from three points of view: *First,* that the present law affects the substantive rights of persons accused of crimes, and is unconstitutional and void in that it deprives a defendant of due process of law, and is an invasion of the guaranteed right of a citizen of this state to a common-law jury trial; *second,* that, when properly construed, the statute eliminates from the consideration of the jury during the trial of the general issue the question of the "legal insanity" of the defendant—the only kind of insanity which excuses one from punishment for a crime committed— but does not prevent the introduction of evidence tending to establish the mental condition of the accused at the time the offense was committed, for the purpose of showing a lack of criminal intent, malice, or premeditation, such evidence to be also considered by the jury, in the exercise of its discretion in a trial for murder, in fixing the degree of the crime and the punishment at life imprisonment or the extreme penalty, if it finds the offense to have been murder in the first degree; *third,* and in support of the validity of the law it is argued that the amendments in question relate merely to procedure in jury trials, and not to substantive law; that the procedural steps provided in no way infringe upon any rights secured to a defendant by the common law, or by the state and federal constitutions.

So far as the common law is concerned, it has no application to this particular question except in so far as it has been incorporated into our law by statutory enactment and judicial decision. It was but natural that the framers of the first state constitution and those called upon to first construe the provisions of that document should turn to that system of jurisprudence with which they were most familiar for precedents in enactment and construction. But when California became organized as a state it began to enact its own statutes to take the place of the provisions of the common law. In 1872 it departed entirely from the ranks of the "common law states," and, following the example particularly of the state of New York, it became a "code state." It enacted four codes, to wit: a Political Code, a Civil Code, a Code of Civil Procedure, and a Penal Code, and declared that each established the laws of the state respecting the subjects to which it related. One of the first provisions (sec.

4) in the Penal Code is that "the rule of the common law that penal statutes are to be strictly construed" has no application to that code, but that, to the contrary, "all its provisions are to be construed according to the fair import of their terms with a view to effect its objects and to promote justice." In the same numbered section of each of the other codes it is declared that the rule of the common law that statutes in derogation thereof are to be strictly construed has no application to such code. At the same time it was enacted that the common law, if repugnant to or inconsistent with the constitution of the United States or the constitution or laws of this state, shall not be the rule of decision in the courts of this state. (Pol. Code, sec. 4468.) ██ So long as the substance of the right to trial by jury, as guaranteed by the constitution, is preserved, the procedure by which this result is reached is wholly within the discretion of the legislature, and the courts may not set aside any legislation in this respect because the form of action—the mere manner in which the questions are submitted—is different from that which obtained at the common law. (*Walker* v. *New Mexico & S. P. R. R. Co.*, 165 U. S. 593, 596 [41 L. Ed. 837, 841, 17 Sup. Ct. Rep. 421, 422, see, also, Rose's U. S. Notes].)

██ We are also satisfied that the present statutes in no way violate the "due process" provisions of either the federal or the state constitutions. ██ The words "due process of law" merely mean law in its regular course of administration, according to prescribed forms and in accordance with the general rules for the protection of individual rights. (*Kalloch* v. *Superior Court*, 56 Cal. 229, 240.) Due process of law is not limited to the due process of the settled usages of the past, but may include new methods of procedure unknown to the common law, provided they are in harmony with the accepted underlying principles of such procedure according to the traditions of the common law. They must be orderly and provide for reasonable notice and opportunity to be heard. (*Hurtado* v. *California*, 110 U. S. 516 [28 L. Ed. 232, 4 Sup. Ct. Rep. 111]; *Twining* v. *New Jersey*, 211 U. S. 78 [53 L. Ed. 97, 29 Sup. Ct. Rep. 14, see, also, Rose's U. S. Notes].) Mr. Cooley, in his work on Constitutional Law, says (p. 224): "When life and liberty are in question there must, in every instance, be judicial proceed-

ings; and that requirement implies an accusation, a hearing before an impartial tribunal with proper jurisdiction, and a conviction and judgment, before the punishment can be inflicted. But the states will prescribe their own mode of proceeding and trial." (See, also, *People* v. *Hickman, supra*.)

 Neither does the present law deprive an accused person of any of the essentials of a common-law jury trial. The state constitution (art. I, sec. 7) declares that "the right of trial by jury shall be secured to all, and remain inviolate," but does not define what that trial is. Whatever the framers of the constitution may have had in mind, it seems to be thoroughly settled that the constitutional guarantee refers to the right to a trial by a jury as known at common law. (*In re Mana,* 178 Cal. 213, 214 [L. R. A. 1918E, 771, 172 Pac. 986].) Juries at the common law were not always the same, but, through changing conditions and gradual development, it came about that a jury for the trial of a cause was established to be "a body of twelve men, described as upright, well qualified and lawful men, disinterested and impartial, not of kin nor personal dependents of either of the parties, having their homes within the jurisdictional limits of the court, drawn and selected by officers free from bias in favor of or against either party, duly impaneled under the direction of a competent court, sworn to render a true verdict according to the law and the evidence given them; who, after hearing the parties and their evidence, and receiving the instructions of the court relative to the law involved in the trial, and deliberating, when necessary, apart from all extraneous influences, must return their unanimous verdict upon the issues submitted to them." (*Opinion of Justices,* 41 N. H. 550, 551, quoted approvingly in *Capital Traction Co.* v. *Hof,* 174 U. S. 1, 15 [43 L. Ed. 873, 19 Sup. Ct. Rep. 580, 586, see, also, Rose's U. S. Notes].) To the same effect, but more concisely stated, was the first definition of a trial jury adopted by the legislature in this state. Section 193 of the Code of Civil Procedure, enacted in 1872, read: "A trial jury is a body of men returned from the citizens of a particular district before a court or officer of competent jurisdiction, and sworn to try and determine, by unanimous verdict, a question of fact." Other than an amendment adopted in 1880, striking out the word "unanimous," in order to permit of a verdict by three-fourths of the jury in

civil cases, in accordance with the provision of the new constitution adopted in 1879, and another amendment in 1917, substituting the word "persons" for the word "men," in order to provide for women jurors, the definition of a jury in this state has remained the same. It is therefore manifest that there is nothing in the new enactments to in any way interfere with the constitutional right of a citizen to a trial by jury, as established by the common law and guaranteed by the federal and state constitutions. (See *Smith* v. *Western Pac. R. Co.*, 203 N. Y. 499 [Ann. Cas. 1913B, 264, 40 L. R. A. (N. S.) 137, 96 N. E. 1106].)

It has been very earnestly argued that the provision that, during the trial of the first issue, one who has interposed the plea of not guilty by reason of insanity shall be conclusively presumed to have been sane at the time of the commission of the offense—the question of his sanity to be subsequently determined, if he be found guilty of the offense charged—amounts to a splitting of the issues and a trial by piecemeal. This contention rests upon the proposition that the issue of not guilty under the first plea contains within it the issue of sanity or insanity. That is undoubtedly true where, as under the old system, but one plea was required; but it does not follow that there is any legal objection to the procedure now prescribed. ■ The plea of insanity is, and of necessity must be, a plea of confession and avoidance. (*State* v. *Lawrence*, 57 Me. 574, 583; *People* v. *Leong Fook* (Crim. 3143), *post*, p. 64 [273 Pac. 779], this day decided.) The requirement under the present system, that the two issues be separately tried, while a departure from the old method of procedure, is but a departure in procedure. Each issue must still be tried by a jury of twelve impartial persons, and the verdict must be unanimous. In substance, the old and the new systems are alike. The guaranteed right of a trial by jury is as inviolate and just as much secured to all under the new system as it was under the old.

The interposition of special pleas by way of abatement, or for the purpose of avoiding punishment for offenses committed, has long been permitted in this state and in other jurisdictions. Special pleas of a former judgment of conviction or acquittal of the offense charged, and of once in jeopardy, have long been recognized. (Pen. Code, sec. 1016.) In other jurisdictions defendants are required to interpose

the special plea of not guilty by reason of insanity where insanity is relied upon for the purpose of escaping punishment, the finding of the jury on that fact to be conclusive during the subsequent proceedings in the cause. Courts in those states have uniformly held that such procedure does not amount to a violation of constitutional provisions, relating to jury trials, similar to our own. In *Bennett* v. *State,* 57 Wis. 69 [46 Am. Rep. 26, 14 N. W. 912], the court upheld the validity of a statute requiring that a defendant specially plead insanity, when relied on as a defense, the issue on the special plea to be first tried; if the verdict of the jury be that the defendant was sane at the time of the commission of the offense, his trial upon the plea of not guilty to at once proceed before the same jury, and the finding of the jury on the special plea to be final and conclusive for the purpose of the further trial. Under provisions of a constitution similar to our own, the supreme court of Wisconsin held that there was no constitutional objection to the statute, and that the other objection, that it required the jury to dispose of the special plea by a verdict thereon before the trial proceeded upon the plea of not guilty, was one relating to the form of jury trial, and not to substance. The court said: ''All the issues would still be tried by a jury in the same way they are now tried. . . . It is clear, if the legislature have the power to compel the defendant to plead insanity as a defense, or waive it, then it has power to prescribe the manner of disposing of that issue on the trial so long as it leaves the accused a trial by jury upon such issue.'' (See, also, *Hempton* v. *State,* 111 Wis. 127 [86 N. W. 596]; *Oborn* v. *State,* 143 Wis. 249 [31 L. R. A. (N. S.) 966, 126 N. W. 737].)

A statute of Alabama providing that where the defense of insanity is relied upon it must be set up by a special plea, and cannot be put in issue under a general plea of not guilty, was held not to contravene any constitutional guarantee. (*Walker* v. *State,* 91 Ala. 76 [9 South. 87]; *Baker* v. *State,* 209 Ala. 142 [95 South. 467].) In *People* v. *Hickman, supra,* this court upheld the constitutionality of section 1016 of the Penal Code, which has the same effect as the Alabama statute. (See, also, *Ex parte Brown,* 39 Wash. 160 [109 Am. St. Rep. 868, 4 Ann. Cas. 488, 1 L. R. A. (N. S.)

540, 81 Pac. 552, 553], and *State* v. *Saffron,* 146 Wash. 202 [262 Pac. 970].)

The trial court committed no error in strictly following the letter of the statute (Pen. Code, secs. 1020 and 1026) and excluding, on the trial of the general issue of not guilty, all evidence tending to show the mental condition of the defendant at the time of the commission of the offense. The doctrine of "partial insanity," announced by some authorities, particularly Wharton in his work on Criminal Law, has never been recognized as the law in this jurisdiction. In this state, in order that "insanity may be available as a defense to a crime charged, it must appear that the defendant, when the act was committed, was so deranged and diseased mentally that he was not conscious of the wrongful nature of the act committed. If he has reasoning capacity sufficient to distinguish between right and wrong, as to the particular act he is doing, knowledge and consciousness that what he is doing is wrong and criminal and will subject him to punishment, he must be held responsible for his conduct. Although he may be laboring under partial insanity, as, for instance, suffering from some insane delusion or hallucination—still, if he understands the nature and character of his action and the consequences—if he has knowledge that it is wrong and criminal, and that if he does the act he will do wrong, such partial insanity or the existence of such delusion or hallucination is not sufficient to relieve him from responsibility for his criminal acts." (*People* v. *Willard,* 150 Cal. 543, 554 [89 Pac. 124, 129]; *People* v. *Kerrigan,* 73 Cal. 222, 225 [14 Pac. 849]. See, also, *People* v. *Hurtado,* 63 Cal. 288.) In this state "so far as accountability to the law is concerned, there is no middle ground." (*People* v. *Perry,* 195 Cal. 623, 639 [234 Pac. 890, 896].) Such is the law in many jurisdictions. (*Warner* v. *State,* 114 Ind. 137 [16 N. E. 189]; *United States* v. *Lee,* 4 Mackey (D. C.), 489 [54 Am. Rep. 293]; *Commonwealth* v. *Wireback,* 190 Pa. St. 138 [70 Am. St. Rep. 625, 42 Atl. 542]; *Dean* v. *State,* 105 Ala. 21 [17 South. 28]; *Wartena* v. *State,* 105 Ind. 445 [5 N. E. 20]; *Kirby* v. *State.* 68 Tex. Cr. Rep. 63 [150 S. W. 455].) "Protection is always afforded in courts of law to persons of unsound mind. Distinction is made between sanity and insanity in people, but not as respects their grade of intelligence. The law does not

attempt to measure degrees of intellect, nor to make distinction with respect thereto, where the power of thought and reason exists.'' (*State* v. *Schlaps,* 78 Mont. 560, 578 [254 Pac. 858, 863].) In 14 R. C. L., page 599, section 54, it is said: ''It is the general rule that insanity, when interposed as a defense in a criminal prosecution, is either a complete defense or none at all, and it has been held that there is no degree of insanity sufficient to acquit of murder but not of manslaughter.'' A valuable note on this subject is found in the case of *Knights* v. *State,* 76 Am. St. Rep. 83 (58 Neb. 225 [78 N. W. 508]).

It follows, therefore, that any evidence tending to establish the insanity of the defendant under his plea of not guilty by reason of insanity at the time of the commission of the homicide, other than evidence of the immediate circumstances of the offense, would have been irrelevant and immaterial on the trial of the general issue as to the guilt or innocence of the defendant raised by the general plea of not guilty. As the statute accorded the defendant his full right, and ample opportunity to submit to a jury his plea of insanity at the time of the commission of the offense, in excuse of his act and as a reason why no penalty of the law should be visited upon him, it follows that the trial court correctly excluded the evidence on the trial of the general issue.

■ Furthermore, the only evidence admissible for the purpose of enabling the jury to determine whether the death penalty or life imprisonment should be imposed in the event the defendant should be found guilty of murder in the first degree was the evidence which the court did admit, and which concerned ''the circumstances connected with the offense.'' (*People* v. *Golsh,* 63 Cal. App. 609, 613 et seq. [219 Pac. 456]; see, also, *People* v. *Witt,* 170 Cal. 104, 110 [148 Pac. 928].) ■ The insanity of a defendant cannot be used for the purpose of reducing his crime from murder in the first degree to murder in the second degree. If responsible at all in this respect, he is responsible in the same degree as a sane man, and if he is not responsible at all he is entitled to an acquittal in both degrees. (*State* v. *Maioni,* 78 N. J. L. 339 [20 Ann. Cas. 204, 74 Atl. 526, 528].)

From these general deductions, applicable to all the cases now in this court in which the new law relating to the plea

of insanity in criminal cases is under attack, we pass to a consideration of the special matters raised by the appellant Troche in his appeal. ▮▮▮ Counsel for appellant argues that the provision of the state constitution guaranteeing a public and a speedy trial to one accused of a crime "means *one* speedy and public trial, and no more." The trial had by the defendant, under the present law, amounted to one trial, and no more. The defendant was charged with the commission of but one crime, and his pleas to the one accusation, constituting his answer and defense, tendered the issues for investigation by the court and the jury selected to try the case. ▮▮▮ Whether the issue of the guilt or innocence of the accused should be tried before or after the trial of the issue of his sanity or insanity, was a question to be determined by the legislature. The order in which the inquiry upon the issues is to be conducted in such a case is a matter which may be regulated by statute, and, if the course prescribed gives the accused the right to present his defense fully upon the trial of the case, he is not deprived of any right or privilege incident to the common-law jury trial. (*Schissler* v. *State*, 122 Wis. 365, 379 [99 N. W. 593].)

Appellant further contends that, as the Criminal Practice Act of 1851 (Stats. 1851, p. 212), and sections 1019 and 1020 of the Penal Code, enacted in 1872, provide that the plea of not guilty puts in issue every material allegation of the indictment or information, and that all matters of fact tending to establish a defense, other than a former judgment of conviction, and once in jeopardy, may be given in evidence under such plea, the action of the trial court in this case was error. An answer to the contention is that the whole matter of trial is one of procedure, which is subject to the control of the legislature, within the limitations we have already discussed, none of which were transcended in the enactment of the new law. A more complete answer to this contention will be found in the decision of this court in *People* v. *Leong Fook* (Crim. 3143), *post*, p. 64 [273 Pac. 779].

▮▮▮ Another contention of the appellant is that the legislature has no right or power to enact a law declaring that, at the time of the commission of an offense, an accused

shall be conclusively presumed to have been sane, or that, at any given time, a person is conclusively presumed to be sane, or insane, and that when the legislature does so it is invading the province of the judicial branch of the government. If the legislature had gone so far as the appellant would lead us to believe, his contention would arouse considerable interest; but it has not. The presumption established is one merely for the purpose of a trial, and is not one of guilt, but only a presumption of sanity. The whole law relating to crimes rests upon the presumption of sanity, and, if it does not exist in any particular case, such case is an exception, and the absence of sanity must be proved by the person asserting it. In conformity with that principle, one who tenders the issue of insanity, as a bar to punishment for an offense committed, must satisfactorily establish such insanity by a preponderance of the evidence. In other matters the accused has only the burden of raising a reasonable doubt in the minds of the jurors. It has long been the law of this state that, "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable." (Pen. Code, sec. 1105.) In view of the general presumption of sanity, which abides until overthrown by the accused by a preponderance of evidence, the legislature has deemed it wise to provide that the plea of insanity at the time of the commission of the offense must be made in a special manner, and that, unless the issue is raised in that way, it will be held to be waived for the purpose of the trial. It goes no further. If the plea may be waived, it would seem to logically follow that, for the purpose of the trial, the accused may be conclusively presumed to have been sane when he committed the act.

The appellant complains that upon the *voir dire* "not one question was asked by the court of any talesmen as to their views as to the defense of insanity." Aside from the fact that appellant's counsel might have examined the

jurors on that subject, it seems that he is mistaken in making this assertion. The reporter's transcript shows that the court, on the *voir dire*, fully instructed the jurors as to the nature of the charge and the defenses the defendant was entitled to make, including the defense of insanity, and asked the jurors if, in view of a trial of the second issue— that of the insanity of the defendant—any of them had any objection to that defense, and if any of them "knew of any reason of any kind whatever why [they] could not act fairly and impartially." Subsequently, when the clerk of the court read the information and stated the plea of the defendant, the court very fully defined the issues to the jury, in the light of the two pleas. The court appears to have made it very clear at that time that, if the jury returned a verdict of guilty on the first issue, it would at once submit the issue of insanity to it.

It is contended that the court and the district attorney were guilty of misconduct, the former in permitting, and the latter in demonstrating before the jury, after the evidence was closed, how many shells the pistol of the defendant would hold. As the pistol was already in evidence, it does not appear that any error resulted from the action complained of.

In support of his plea that he was insane at the time of the homicide, and that the direct cause of the act was an attack of insanity suffered by him after his fiancee and he left San Francisco, appellant offered evidence showing that he had received a severe fracture of the skull by a fall from a tree when he was ten years old, and that he had suffered from temporary insanity on many occasions. There is no question but that all those facts were established; but, a doctor who had the defendant under observation from the time of the homicide until the trial, during which period the defendant talked freely of his crime, testified that, during the greater part of that period the defendant was rational. The superintendent of one of the state hospitals for the insane, testifying as an expert, declared the defendant was sane when he committed the homicide. Under full and accurate instructions on the subject of insanity, as viewed in this state, when interposed by one seeking immunity from punishment for a crime committed, the jury found that the

defendant was sane at the time he killed his sweetheart. The finding of the jury concludes the question.

The judgment is affirmed.

Shenk, J., Curtis, J., Richards, J., Langdon, J., and Seawell, J., concurred.

PRESTON, J., Dissenting.—I dissent. I cannot reach the conviction that the majority opinion is sound. No authority is cited that supports it. In fact, I do not believe it covers accurately the points of attack upon the validity of the statutes. The first statute involved may be set out again as follows:

Section 1026 of the Penal Code, enacted in 1927, reads in part: "When a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, he shall first be tried as if he had entered such other plea or pleas only, and in such trial he shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed. If the jury shall find the defendant guilty, or if the defendant pleads only not guilty by reason of insanity, then the question whether the defendant was sane or insane at the time the offense was committed shall be promptly tried, either before the same jury or before a new jury, in the discretion of the court. In such trial the jury shall return a verdict either that the defendant was sane at the time the offense was committed or that he was insane at the time the offense was committed. . . . ''

With this provision must stand or fall the amendment passed at the same time to section 1020 of the Penal Code, which amendment omits the word "and" formerly found between the words "third" and "fourth," in line two, and adds after the said word "fourth" the words "and fifth," making the section as amended read as follows: "All matters of fact tending to establish a defense other than one specified in the third, fourth and fifth subdivisions of section 1016 may be given in evidence under the plea of not guilty." The effect of said amendment is to provide that evidence of insanity at the time of commission of the act may not be given upon the trial under the plea of "not guilty." It should also be first noted that likewise, in 1927, section 1016 of the Penal Code was amended to provide for

the interposition of this fifth plea, to wit: a special plea of "not guilty by reason of insanity."

As I understand the main opinion it concludes that the steps inserted in the statutes by the amendments of 1927 were merely procedural, involving no invasion of the substantial rights of a defendant. It is my view that no legal basis can be found upon which to rest these provisions, and, moreover, that no beneficial results can flow from their practical operation. The conscience immediately rebels when the effect of these provisions is contemplated. They are no more nor less than provisions intended to hamper the free, full and fair consideration of the cause by the jury, a cause, too, which involves the life or liberty of the citizen. The state, representing the whole people, can least afford to be cruel or unjust. These provisions savor of oppression. The rights of the state and the accused are not equal upon entering the temple of justice. The scales of justice are out of balance. A man may not be both guilty and innocent at the same time of a single charge. If the defendant, though insane or an idiot, must first be convicted, and then inquiry by the same jury is made as to his innocence, something is radically wrong. Such a law seems on its face clearly to be a step toward a return to the dark ages.

It will be noted that on the first half of this bifurcated trial or hearing under this procedure the jury may not stop by merely finding that the defendant physically did or did not do the prohibited act. The jury must go further and find the existence or absence of all the elements of the crime charged. The jury must convict the defendant before any verdict adjudicating sanity may be announced. Even though the jury believe the defendant to have been insane, and, for that matter, to be still insane, yet under its oath it must, in violation thereof, attribute sanity to him, convict him of the crime, report the finding to the court, and assent in open court to the result. Indeed, in a case of first degree murder the jury must also fix the punishment at life or death. The defendant, in other words, with condemnation resting upon his head and in some instances with execution facing him, must submit the issue of his sanity to the judgment of his condemnors, condemnors who have already adjudged him sane upon a modicum only of the available evidence that should have been considered by them.

I repeat that a sovereign must indeed be unjust who exacts a verdict of guilty by such a method. Surely this court has the power and is charged absolutely with the duty of preventing such a misuse of the machinery of justice.

But the legal infirmities of these provisions are easily discerned. They undertake to subdivide an indivisible integer, and therein lies their chief infirmity. In other words, the plea of not guilty necessarily includes within it the element of insanity. This is true not because of any legislative fiat, but because sanity is a fundamental element of all amenableness to punishment and is the prime ingredient of the criminal legislation of all civilized countries. (See Pen. Code, secs. 20, 21, 26.) There can be no malice, deliberation or premeditation without sanity. There can be no criminal intent—indeed, no criminal act—where there is no sanity. If the jury, in ascertaining the intent of the defendant, may not consider the evidence of his insanity, it must follow that the legislature has the power to dispense entirely with the element of intent. Yes, more is true: If the jury may not, before assessing guilt to the defendant, consider the fact that he is insane, not only may criminal intent be dispensed with, but the time-honored and almost sacred presumption of innocence may be set at naught by the law-making power. (See *State* v. *Strassburg,* 60 Wash. 106 [Ann. Cas. 1912B, 917, 32 L. R. A. (N. S.) 1216, 110 Pac. 1020].)

What think ye of a statute providing that if A commits the physical act of killing B, he shall be declared by law guilty of murder in the first degree, and upon arrest of the person thought to be the criminal he shall be conclusively presumed to be the party wanted, but, after his conviction, he may for the first time have a hearing before the same jury as to whether or not he is the man who really committed the act? If the provisions under review are procedural only, so must it be in the situation I have supposed.

What a storm of protest would arise if the legislature had provided that on the first trial under this procedure a defendant is conclusively presumed to have been insane. Would the prosecution have admitted then that this change was only procedural? Or suppose that the legislature had provided that on the first trial sanity should be conclusively presumed, but on the second trial insanity should be con-

clusively presumed. This mere act of reforming procedure would in that case be an entire nullification of the whole criminal law. Would such a strangulation of justice be held procedural only? So a mere contemplation of the effect of these provisions proves more clearly than words could express that the procedure outlined by the statutes is a procedure which destroys for all practical purposes the defense of insanity and thereby destroys one of the principal rights of a person charged with the crime.

It has been said, however, that these changes are procedural because the verdict on the first trial is but a conditional verdict. Is it possible that motive or criminal intent exists or can exist conditionally or hypothetically? They are either present or absent. The admixture making up the compound of criminal intent is not capable of a hypothetical or conditional or presumed existence. It may not be presumed to exist, then reach a conclusion of guilty based on such presumption, and, while still holding to this conclusion, undertake to determine the existence of intent. This is "boot-strap" lifting, *petitio principii.*

Would anyone defend a statute which provided that a defendant must first be found guilty and then the same jury be required to retire and consider whether or not the defendant committed the act or was in fact the party wanted for the crime? This contention that the verdict is only conditional illuminates the positive conclusion that the statute is mischievous, unfair and unjust, and contrary to the basic principles underlying our criminal law. Again it is said that it is procedural because on the second trial the jury may pass upon the question of the defendant's sanity. We have already observed that there could be no criminal intent, malice, premeditation or deliberation without the functioning of a sound but vicious mind. We have already observed that sanity is a necessary element of all crime. A defendant who is convicted has been thereby not only found guilty but also found to be sane. This conclusion is inescapable and undeniable. The jury on the first hearing has therefore passed upon the defendant's sanity, determined the issue against him, and done so on a consideration of a portion only of the evidence that must be again passed upon at the second or final hearing.

Is a juror who, after having heard the circumstances of the offense, and after having seen the defendant, and after having heard his testimony and decided that he is sane, in any condition of mind to be impartial when sitting in review upon his own act solemnly performed under oath and reported to the court? I submit that no juror, whatever his degree of mentality or whatever his degree of theoretical fairness, could impartially rejudge the second issue. No human mind, with the elements we know to exist in it, could do so. That is why our statute (sec. 1073, subd. 2, Pen. Code) provides that a juror may be challenged "for the existence of a state of mind" in reference to the case, "which will prevent him from acting with entire impartiality and without prejudice to the substantial rights of either party." That is also the reason underlying section 1074 of the Penal Code (subd. 4), which provides that a citizen may not sit as a juror if he has served on the grand jury which found the indictment, or on a coroner's jury which inquired into the death of a person whose death is the subject of the indictment or information; and subdivision 6 of the same section, which forbids a citizen to sit as a juror if he has been "one of a jury formerly sworn to try the same charge, and whose verdict was set aside, or which was discharged without a verdict, after the case was submitted to it." Yet under the statutes under review it is permissible for the jury which has actually convicted the defendant, and in this case sentenced him to death, to sit again upon the issue of sanity.

The contention is made that there is but one trial. If this is true, then why not dispose of both pleas at one hearing? Why seek to prejudice, shackle and intimidate the jury by calling them into court in the midst of their deliberations and have them deliver a verdict which prejudges the undetermined issue involved? It is no parallel to this situation to say that the pleas of former acquittal, former conviction or other special pleas may be heard separately and, therefore, the plea of insanity may also be heard in like manner. This is untenable for the reason pointed out above, that insanity is a necessary ingredient of the plea of not guilty, whereas these special pleas rest upon their own separate foundations, and do not depend in any respect upon the plea of not guilty.

Reference is made to the case of *Bennett* v. *State*, 57 Wis. 69 [46 Am. Rep. 26, 14 N. W. 912], wherein the court upheld the validity of a statute requiring that a defendant specially plead insanity, when relied on as a defense, the issue on the special plea to be first tried. That procedure is not constitutionally objectionable, and the reason is, that on that issue every item of evidence admissible under the plea of not guilty may be heard and should be heard on the plea of insanity, and the result is that such a practice involves two separate, distinct but full and complete trials of the case. No defendant can constitutionally object to such procedure, nor could he object to a procedure which authorized a new jury for the issue of insanity if the whole field of guilt or innocence could again be traversed. That this duplicate procedure was found impracticable is evidenced by the fact that in 1911 the state of Wisconsin abandoned it by repeal of the statute.

However, in the case of *French* v. *State*, 85 Wis. 400 [39 Am. St. Rep. 855, 21 L. R. A. 402, 55 N. W. 566], where the jury which sat on the insanity hearing was unable to agree and was required to sit upon the plea of not guilty over the objections of defendant, the court of that same state had this to say: ''The case stood precisely as it would if these statutes in relation to a special issue of insanity had not been enacted. The accused is placed on trial for the crime. His insanity is a question material to the case. A jury is forced upon him to try his case, all of whom had formed and expressed an opinion on the question whether he was or was not insane when he killed the deceased. Does the law suffer or sanction such a biased, partial and prejudiced jury for the trial of one charged with the crime of murder? Anyone would say that this would be a judicial outrage upon the legal and constitutional rights of the accused. And yet this is just such a case. The accused has the right to demand that he be tried before a fair and impartial jury. Constitution, article I, section 7, provides that the accused shall have 'a speedy public trial before an impartial jury.' Besides this, the right of the accused to have a jury specially selected and impaneled to try him for the crime charged, and his right of challenge, were cut off and denied. It is obvious and self-evident that this jury was an unlawful one, and that the accused was deprived of his

constitutional right of trial by jury. It has been uniformly held, and from early times in the history of jury trials for crime, that the grand jury that found the indictment, and each one of them, is disqualified from sitting on the petit jury to try the accused."

This language is clearly applicable to a jury which the law requires to report their adverse conclusion before they finish their deliberations on the same issue. Due process of law is defined as follows: "By the law of the land is most clearly intended the general law, a law which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial. The meaning is that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society. Everything which may pass under the form of an enactment is not, therefore, to be considered the law of the land." (*Dartmouth College* v. *Woodward,* 4 Wheat. (17 U. S.) 517, 581 [4 L. Ed. 629, see, also, Rose's U. S. Notes].) Volumes might be quoted on this subject, but no clearer statement can be found than the above. Who can state that these provisions meet this test?

In thus making a judicial inquiry as to the existence of a fact, to wit, guilt or innocence, the court and jury are circumscribed by a legislative declaration which forbids the introduction of essential evidence upon that issue by declaring that a necessary element of guilt be conclusively presumed. Is this due process of law? Has the defendant in such case had his full day in court? May the legislature thus commit an incursion into the domain of the courts? The answer universally given is "No." Even in civil cases, unless the legislature is making substantive law and not merely rules of evidence, it may not make one fact conclusive evidence of another.

Says Mr. Wigmore (2 Wigmore on Evidence, 2d ed., p. 1057, sec. 1353): "The judicial function under the Constitution is to apply the law in controverted cases; to apply the law necessarily involves the determination of the facts; to determine the facts necessarily involves the investigation of evidence as a basis for that determination. To forbid investigation is to forbid the exercise of an indestructible judicial function. To make a rule of conclusive evidence,

compulsory upon the Judiciary, is to attempt an infringement upon their exclusive province."

Again, Judge Cooley wrote: "But there are fixed bounds to the power of the legislature over this subject which cannot be exceeded. As to what shall be evidence, and which party shall assume the burden of proof in civil cases, its authority is practically unrestricted, so long as its regulations are impartial and uniform; but it has no power to establish rules which, under pretense of regulating the presentation of evidence, go so far as altogether to preclude a party from exhibiting his rights. Except in those cases which fall within the familiar doctrine of estoppel at the common law, or other cases resting upon the like reasons, it would not, we apprehend, be in the power of the legislature to declare that a particular item of evidence should preclude a party from establishing his rights in opposition to it. In judicial investigations the law of the land requires an opportunity for a trial; and there can be no trial if only one party is suffered to produce his proofs." (2 Cooley's Constitutional Limitations, 8th ed., Carrington, pp. 768, 769.)

In *State* v. *Beach,* 147 Ind. 74 [36 L. R. A. 179, 46 N. E. 145, 146], the rule, with a superabundance of authority to sustain it, has been stated as follows: "We think it clear that the legislature has the power to prescribe rules of evidence and methods of proof. A law which would, in effect, exclude the evidence of a party, and thereby deny him the right to be heard, would deprive him of due process of law. A law which provides that certain facts are conclusive proof of guilt would be unconstitutional, as also would one which makes an act *prima facie* evidence of crime which has no relation to a criminal act, and no tendency whatever to establish a criminal act. If, however, the legislature, in prescribing the rules of evidence in any class of cases, leaves a party a fair opportunity to establish his case or defense, and give in evidence to the court or jury all the facts legitimately bearing on the issues in the cause to be considered and weighed by the tribunal trying the same, such acts of the legislature are not unconstitutional."

In *Vega S. S. Co.* v. *Consolidated Elevator Co.,* 75 Minn. 308, 312 [74 Am. St. Rep. 484, 43 L. R. A. 843, 77 N. W. 973, 974], the court, in discussing the legality of a statute that made conclusive the certificate of a state weighmaster,

said: "But is it competent for the legislature to make the weight thus ascertained absolutely conclusive? We are of the opinion that it is not. The legislature cannot in this manner provide for the arbitrary exercise of power, so as to deprive a person of his day in court to vindicate his rights. And the law which closes his mouth absolutely when he comes into court is the same, in effect, as the law which deprives him of his day in court (citing many cases)."

An early annotator stated the rule as follows: "In criminal prosecutions, we apprehend that under no circumstances can the legislature create a conclusive presumption of guilt, nor deprive the accused of the right to offer proof of his innocence, nor require the jury to disregard such proof, nor to give effect to any presumption of the truth of which they are not satisfied. *Voght* v. *State*, 124 Ind. 358 [24 N. E. 680]; *State* v. *Beswick*, 13 R. I. 211 [43 Am. Rep. 26]." (Note, *People* v. *Cannon*, 36 Am. St. Rep. 689 (139 N. Y. 32 [34 N. E. 759].)

A case often cited and frequently distinguished, but at no time overthrown, is *Hammond* v. *State*, 78 Ohio St. 15 [125 Am. St. Rep. 684, 14 Ann. Cas. 732, 15 L. R. A. (N. S.), 906, 84 N. E. 416], where the court had under consideration a statutory provision as follows: "The character of the trust or combination alleged may be established by proof of its general reputation as such." The court, in declaring it invalid, said: "It may be conceded that, within proper constitutional limits, the legislature has the general power to prescribe rules of evidence and methods of proof— to determine what may or may not be competent evidence in a particular case—and, with certain qualifications, has, perhaps, the power to enact and prescribe that in criminal prosecutions certain facts, when duly established, shall be held to be presumptive or *prima facie* evidence of guilt. But this power is not without its limitations, one of which is that the legislature may not arbitrarily create a conclusive presumption of guilt against the accused, as to any element of the crime charged, by giving artificial and evidential force and effect to certain facts which otherwise would be wholly irrelevant and inconclusive. . . . Thus, the statute in terms makes proof of the general reputation of the trust or combination, not only competent evidence against the accused, but sufficient and conclusive evidence

of the unlawful and criminal character of the combination to which he may belong. This, in effect, is to deprive the accused of the protection of the cardinal presumption that every person is to be presumed innocent until he is legally proven guilty—a presumption which attends the accused throughout his trial, and has reference and relation to every fact that must be established in order to prove his guilt beyond a reasonable doubt. If the general assembly, in order to make conviction easier under this act, can rightfully provide that one of the essential and constituent elements of the crime charged, viz., the unlawful character of the trust or combination, may be shown and made certain by proof of common rumor or general reputation, and the guilt of the accused be thus established, it is difficult to see why it may not, with equal right, provide that murder, arson, or any other crime may be thus established by proof that the person accused thereof is generally reputed to be the person who committed the same—a proposition at once so obnoxious and repugnant to the plainest principles of reason and justice that none would yield assent to it. . . . To concede to the legislature the power to provide, in prosecutions under the act here in question, that the unlawful character of the combination to which the defendant belongs may be established—that is, made certain—by proof of its general reputation as such, is to grant that the legislature has power to, and may, in a criminal case, prescribe a rule of conclusive evidence as to a vital and controlling fact that shall be binding alike upon court and jury. This the general assembly may not do."

Mr. Justice Lurton, in the case of *Mobile etc. R. R.* v. *Turnipseed*, 219 U. S. 35, 42, 43 [Ann. Cas. 1912A, 463, 32 L. R. A. (N. S.) 226, 55 L. Ed. 78, 31 Sup. Ct. Rep. 136, 137, see, also, Rose's U. S. Notes], summed the whole situation up in a single paragraph: "The law of evidence is full of presumptions, either of fact or law. The former are, of course, disputable, and the strength of any inference of one fact from proof of another depends upon the generality of the experience upon which it is founded. . . . Legislation providing that proof of one fact shall constitute *prima facie* evidence of the main fact in issue is but to enact a rule of evidence, and quite within the general power of government. Statutes, national and state, dealing with such meth-

ods of proof in both civil and criminal cases abound, and the decisions upholding them are numerous. . . . That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate, So, also, it must not, under guise of regulating the presentation of evidence, operate to preclude the party from the right to present his defense to the main fact thus presumed.''

A recent annotator put the question in this form: ''The general proposition is supported by many cases that a legislature cannot constitutionally make one fact conclusive evidence of another material fact in controversy, if the former is not, in and of itself, by virtue of its own force, conclusive.'' (51 A. L. R., p. 1149. See *Griffin* v. *State,* 142 Ga. 636 [Ann. Cas. 1916C, 80, L. R. A. 1915C, 716, 83 S. E. 540].)

It will be noted that the above quotations from the opinion in the case of *Hammond* v. *State, supra,* bring vividly into play the further evident proposition that to conclusively presume any ingredient of crime is to clash squarely with the presumption of innocence. The defendant in such case enters upon his trial not surrounded by this ancient and wise safeguard but must yield that advantage in part at least to a presumption of an element of guilt which, though he may be able to do so, the strong arm of the law forbids him an opportunity to combat.

This is no time or place for a lengthy dissertation upon this presumption, but it may be well remembered that its object is to protect the innocent and not to shield the guilty. It is a presumption of both law and fact. It was present in the Roman law and some authorities state that it marks back through Sparta and Athens to the Book of Deuteronomy. It was known to be a part of the common law as early as 1802. In 1817 Lord Gillies, in *McKinley's Case* (33 St. Tr. 275, 506), in speaking of this presumption said, among other things: ''It is a maxim which ought to be inscribed in indelible characters in the heart of every judge and juryman; and I was happy to hear from Lord Hermand

he is inclined to give full effect to it. To overturn this, there must be legal evidence of guilt, carrying home a degree of conviction short only of absolute certainty."

Blackstone maintained (1753-1765) that: "the law holds that it is better that ten guilty persons escape than that one innocent suffer." (4 Bl. Com., chap. 27, margin page 358, *ad finem.*)

It is the strongest presumption known to the law. It is as much a part of our constitution, both state and national, as if it were written therein in letters of burnished gold. This fact has been assumed many times in this state and in one case at least expressly stated (*In re Wong Hane,* 108 Cal. 680 [49 Am. St. Rep. 138, 41 Pac. 693]). We presume that no one would contend that this presumption could be overthrown by any statutory enactment. *Prima facie* evidence or presumptions may be declared to exist where they flow logically from certain facts, but the presumption of innocence is ever present even in the deliberations of the jury and may alone and of itself sometimes avail to acquit the defendant.

This court should be quick and decisive in its action to declare anew our bill of rights and to preserve the essential attributes of a jury trial as known to the common law and as preserved by our constitution (art. I, secs. 7 and 13, Const.). These provisions are so obnoxious to the spirit of our institutions that the blood of Abel "crieth from the ground" for vindication.

The question of the degree of insanity that shall constitute a defense of crime is not here involved and no reason exists to question the established rule on this subject (*People* v. *Willard,* 150 Cal. 543 [89 Pac. 124]; *People* v. *Gilberg,* 197 Cal. 306, 314 [240 Pac. 1000]; *People* v. *Sloper,* 198 Cal. 238, 245 [244 Pac. 362]).

It should here be noted that the striking down of these provisions will in nowise hamper but on the contrary will greatly aid the administration of the criminal law. The pleas, and the effect thereof, provided for in section 1016 of the Penal Code, will remain intact and fully effective (*People* v. *Hickman,* 204 Cal. 470 [268 Pac. 909]). Hereafter a plea of not guilty and the special plea of not guilty by reason of insanity will be tried at the same time before a single jury as in the states of Wisconsin and Washington,

and perhaps other states, and the jury may be, and doubtless will, under all proper circumstances, be required to find on the special plea. Defendant will, in case of a verdict that he was insane at the time of the commission of the offense, be dealt with as provided in the remaining portion of said section 1026 of the Penal Code.

It may also be said that it is not every double trial that would entitle a defendant to reversal of the judgment of conviction—only those cases where it can be seen that prejudice has been suffered by him. If there be no evidence produced upon the second hearing that would warrant or justify a finding that the defendant was insane, then, of course, no error would appear, but in the case before us there was substantial evidence, in addition to the circumstances of the case, which would have supported the verdict that defendant was insane at the time he committed the act; therefore, prejudicial error appeared in the case before us.

It may here also be said that we have not presented this dissent upon the ground that the jury in assessing the punishment of death in this case should have been allowed to receive all or a portion of the evidence admissible upon the issue of insanity in order that it might determine in a just manner the question of punishment. I prefer to rest my conclusion upon a broader ground and content myself with citing that situation as additional evidence of the inhumanity of the provisions under consideration. The judgment should be reversed.

Hearing in Bank denied.

Preston, J., dissented.